## UNITED STATES v. GENERAL AMUSEMENT CO. OF ARIZONA et al.

District Court, D. Arizona.    May 23, 1927.

1. **Intoxicating liquors** ⬅️➡️275—**Evidence held to show maintenance of liquor nuisance (National Prohibition Act [Comp. St. § 10138¼ et seq.).**

   Evidence *held* to establish that the dance and lunch pavilions in an amusement park, as operated, constituted a common nuisance within National Prohibition Act (Comp. St. § 10138¼ et seq.).

2. **Intoxicating liquors** ⬅️➡️275—**Where existence of nuisance is shown, burden is on defendant to show its discontinuance (National Prohibition Act, tit. 2, § 22 [Comp. St. § 10138½k]).**

   Where the evidence for the government has clearly shown that a place as conducted constituted a common nuisance within National Prohibition Act, tit. 2, § 22 (Comp. St. §§ 10138½k), the burden is on defendant to as clearly show that it has ceased to be such to prevent granting of an injunction for its abatement.

In Equity.    Suit by the United States against the General Amusement Company of Arizona and another.    Decree for complainant.

George Guy Axline and George R. Hill, Asst. U. S. Attys., both of Phœnix, Ariz.

Thomas J. Croaff, Joseph W. Conway, and C. R. Holton, all of Phœnix, Ariz., for defendants.

JACOBS, District Judge. This is an injunction suit brought by the government under section 22 of title 2 of the National Prohibition Act (Comp. St. § 10138½k), to abate a nuisance alleged to be maintained on the premises known as "Joyland Casino" and "The Palms," situated in Maricopa county, state and district of Arizona, on a tract of land comprising about 18 acres on the south side of the Phœnix-Tempe Highway about 3½ miles east of the city of Phœnix.

It is alleged in the bill that the General Amusement Company of Arizona is an Arizona corporation, and that the defendant Murray J. Morley is the general manager of the business conducted; that the buildings known as "The Palms" and "Joyland Casino" have, during the months of December, 1926, and January, February, and March, 1927, been used and maintained as places where intoxicating liquor, as defined by section 1, tit. 2, of the National Prohibition Act (Comp. St. § 10138½) is sold, bartered, possessed, and kept for sale for beverage purposes in violation of law by the defendants General Amusement Company of Arizona and the said Murray J. Morley, and that said places are now and have been a common, public, and continuing nuisance since and including the months of December, A. D. 1926; that the said defendants and each of them knew and had reason to believe that intoxicating liquor was kept, bartered, and consumed on the said premises in violation of law, by defendants' agents, employees, tenants, and patrons, during the period mentioned.

It is further alleged that on March 8, 9, and 17, 1927, Harry Nash and "Sonny" L. W. Wallace, employees, agents, and tenants of the defendants, sold to one George H. Hudson, on said premises known as "The Palms" certain intoxicating liquor for beverage purposes, for which he paid sums ranging from $2.50 to $5.50; that on the 18th day of March, 1927, Federal Prohibition Agents George H. Hudson and Frank W. Akin searched the premises known as "The Palms" and seized a quantity of intoxicating liquor; that during the month of December, 1926, and the months of January, February, and March, 1927, various individuals, patrons of the defendants, kept, con-

sumed, and disposed of different quantities of intoxicating liquor on the said premises.

By the answer, the defendants admit that they are the owners of the property and premises described, and deny that the said premises have been or are being used in connection with the keeping, selling, and drinking of intoxicating liquor, as defined by the Prohibition Act and deny that the buildings are maintained and operated as a common nuisance within the meaning of the law. They admit that the defendant Murray J. Morley is the president and managing director of the General Amusement Company of Arizona, and deny that the premises were used in any manner in violation of the National Prohibition Act or that the said premises have been or are conducted as a nuisance as defined in the act. The defendants allege that they are law-abiding citizens, desirous of respecting the laws of the United States; that they have at all times been and are now willing and anxious to co-operate with the properly constituted officers for the purpose of effectually preventing any violations of the law and particularly of the National Prohibition Act upon said premises; that they have not willingly done or suffered others to do any unlawful acts upon the premises, and will not do so in the future; and that, should it appear upon the hearing or trial of this cause any acts have been done upon the said premises that constitute a common nuisance within the meaning of the law, the defendants are ready and willing to furnish a bond in such sum and with such sureties as the court may direct, conditioned as the law directs, to permit the use and conduct of a lawful and orderly business of the defendants upon said premises.

The trial of the case commenced on the 16th day of May and continued each day to and including the 20th day of May, 1927. Many witnesses were sworn and examined on behalf of the government and the defendants.

[1] It appears from the evidence that in each of the buildings known as "The Palms" and "Joyland Casino" there is a public dance hall; that tables and chairs are provided for the convenience of guests; that "soft drink" stands are maintained; that a kitchen containing ice boxes and cooking paraphernalia is maintained, where lunches are prepared for service to the patrons; that the defendants granted a soft drink and lunch concession to a colored man known as "Sonny" Wallace, and that the said Wallace took in as a partner in said concession another col-

ored man named Harry Nash, and that these concessionaires employed a cook to prepare lunches which were served by them to the patrons of these establishments; that the defendants employed a man named White, who acted as superintendent and, in the absence of the defendant Morley, as manager. They also employed a man named Leonard William John Drey, who posed as a deputy sheriff, but who testified that his commission was issued to him, not by the sheriff, but by a real estate agent in the city of Phœnix.

The evidence further shows that an agreement was entered into between the defendants and one McKay, whereby McKay was to furnish dance music for "The Palms" and the "Joyland Casino" and was to receive from 50 to 60 per cent. of the gate receipts and the receipts from dance tickets; that a general admission ranging from 25 cents to 50 cents was charged, and that dance tickets were sold at 10 cents each; that shares of stock in the defendant corporation were sold to many people in and about the city of Phœnix, and that with each share of stock a free pass was issued, which entitled the stockholders to admission and free dancing at both The Palms and the Joyland Casino. It further appears that on many nights the public was admitted without charge up to 10 o'clock p. m., and that after that hour they were charged the general admission before mentioned.

The evidence introduced by the government shows that public dances were held nightly at The Palms, and that on Saturday nights and holidays the public was admitted to the Joyland Casino, which contains a larger dance floor and is equipped to accommodate a greater number of people than The Palms; that the nightly attendance at The Palms ranged from 20 to 75 persons, while the attendance on Saturday nights and holidays at the Joyland Casino ran as high as 400 or 500 persons. The evidence further shows that the witness Hudson, who was a federal prohibition agent, on several occasions purchased intoxicating liquor from the said "Sonny" Wallace and Harry Nash, as alleged in the bill, and that on the 18th day of March a search warrant was obtained and a search of the premises was conducted and a certain quantity of intoxicating liquor was found stored in the ice box in the kitchen at The Palms; that many of the people who patronized these premises brought intoxicating liquor with them in screw top medicine bottles; that they occupied chairs at the tables and were served with ginger ale, ice,

and empty glasses; that they put the whisky in the ginger ale and consumed it on the premises; that many of these people became highly intoxicated, and that fights occurred; that many of the patrons were boys and girls from 15 to 22 and 25 years of age; that on one occasion a girl about 15 years of age was seen lying on the ground near the entrance to the premises drunk and unable to walk; that on another occasion a girl about 18 years of age was highly intoxicated; that she was unable to walk alone and two men supported her and escorted her from the dance hall; that a patron, a young man then 17 years of age, on one occasion went to Joyland Casino in company with other boys about his age and purchased intoxicating liquor of the said "Sonny" Wallace.

The evidence further shows that at the close of these dances at the Joyland Casino there were as many as 250 empty whisky bottles found in the lavatory; that the defendant Morley appealed to the sheriff of Maricopa County for officers to maintain order and quiet at these places, and that five officers were detailed on duty at the places; that these officers took bottles containing whisky from the pockets of many of the patrons; that as a result of this practice the patronage dropped off and the defendant Morley stated to the witness McKay that he would have to tame these officers, as the practice was interfering with his business; that he instructed the officers to discontinue the practice, and that shortly thereafter three of the officers were withdrawn from duty at the premises.

The evidence further shows that the said "Sonny" Wallace and Harry Nash purchased liquor for sale to the patrons, and that the liquor was stored on the grounds and in the ice box at The Palms, and that the alleged Deputy Sheriff Drey soon learned that they were selling intoxicating liquor and insisted that he be given a third of the profits derived from the sales, and agreed to prevent all other bootleggers from operating on the premises and to create a monopoly of the business for the said Wallace and Nash; that thereupon the superintendent, Mr. White, discovered that these people were operating in the illicit traffic of liquor and "declared himself in on the enterprise" and insisted upon a division of the profits; that the first money paid to the said White was the sum of $9, and that he complained to Wallace, stating that he knew, from the number of empty whisky bottles found by him, that his share in this enterprise should be greater than the sum paid him; that on oc-

casions patrons became intoxicated and broke the furniture, and the defendant Morley instructed the witness McKay that when this occurred he should collect the amount of damages from such patrons; that the patrons parked their cars in the grounds near the Joyland Casino and The Palms; that, from the testimony of one witness, it appears that on one occasion a young couple were seen in an automobile on the premises under an electric light indulging in an immoral act; that on another occasion two patrons drove in upon the premises and were met by the said alleged deputy sheriff, who was highly intoxicated, and tried to sell them a bottle of whisky. The witness McKay testified that "Joyland Casino was the rendezvous of all the drunks after everything was closed up down town."

Many of these facts are not denied by the defendants' witnesses. They all admit that drinking occurred on the premises. Some say that they did not see these things occur, but they do not deny that they did occur. One witness for the defendant said he had never seen a person drunk on the premises, but, upon examination, it developed that his idea of a drunken person was a person who was prostrate from drinking intoxicating liquor and unable to rise.

The evidence further shows that the defendant Morley was frequently present and mingled with the crowd and knew that his patrons were bringing liquor upon the premises and drinking it; knew that many of them became intoxicated. In fact, he admits it and tries to justify his position by stating that he appealed to the officers to assist him in suppressing the practice, and that he told the witness McKay that he could not suppress this practice and operate the business successfully. The above facts clearly appear from the evidence adduced in the trial of this case.

[2] Counsel for the defendants urge the fact that there is no evidence of any continuation of the nuisance, if one existed, since the date of the filing of the bill, March 22, 1927, and that the nuisance, if any, has been abated, and that there is nothing to enjoin, and cite numerous cases to the effect that, where the nuisance has been voluntarily abated, no injunction should be granted. The government contends that the burden is upon the defendants clearly to show the cessation of the nuisance, and, in support of this contention, cite the case of United States v. Budar et al. (D. C.) 9 F.(2d) 126, in which it is said:

"In the Gerold Case, some suggestion was put forward that the government's proof failed to show that, after the raid of August 22d, the nuisance continued. In my judgment the clear response to this is that the defendant failed to show that the nuisance was abated. I am unwilling to accept his rather mild and almost inaudible statement in court that, after August 22d he told some one that they could have no liquor on the premises, as evidencing an abatement. The history of the place, its large patronage, and the clear cognizance attributed to police and other public officials of what was going on there, would seem to demand from the defendants' side a clear showing of the cessation of the nuisance—in other words, the proof of abatement ought to measure up in quantum and quality with the proof of previous existence."

From the evidence introduced, it is doubtful if any honest intention existed in the minds of defendants to abate this nuisance. The government introduced in evidence a handbill advertising a carnival dance to be held March 26, 1927, and was evidently issued after the bill of complaint was filed. This handbill contains the following:

"Padlocked? No! Not Yet!! Joyland will stage Saturday night, March 26, the biggest and greatest carnival dance ever witnessed in Arizona. We invite everybody to come out and see just how tough Joyland is. No matter what you have heard, read, or believe. Be just to yourself and 'the other fellow' just once. We guarantee Joyland will be run next Saturday night just as it was last Saturday night or any other Saturday night—no better—no worse. Then compare it with any other public dance resort in this valley. * * * [Signed] General Amusement Company of Arizona, M. J. Morley, Managing Director."

The defendants, at the time of publishing this advertising, had no intention of bettering the conditions existing at the Joyland Casino in the months of December, 1926, and January, February, and March, 1927, but evidently justified the conditions by comparison with other public dance resorts, as they guarantee to the public that Joyland will be run next Saturday night just as it was last Saturday night or any other Saturday night, *no better,* no worse.

In the case of United States against Studio Club (D. C.) 12 F.(2d) 462, Judge Thacher said:

"There can be no doubt that the statute is to be construed as authorizing the exercise of power, conferred by statute or inherently possessed, solely for the purpose of abating an existing nuisance. * * * The decree is always to be addressed to the rights existing, not at the moment of suit begun, but at the time of its determination. U. S. v. Gaffney et al. (C. C. A.) 10 F.(2d) 694. If, therefore, the nuisance has ceased to exist, in the sense that there is no reasonable likelihood of its recurrence, dismissal of the suit would necessarily follow. U. S. v. Chesebrough Mfg. Co. et al. (D. C.) 11 F.(2d) 537. As stated by Judge Hough in the Gaffney Case, the suit in a certain sense is 'against the nuisance.' If there be no nuisance, there can be no decree abating it.

"The question, therefore, is whether, upon the facts disclosed by this record, there is a reasonable likelihood of a recurrence of the unlawful use of the premises in question. U. S. v. Margolis (D. C.) 289 F. 161. In determining this question, it is important to consider the character of the premises and of the violations which have occurred there. We are here dealing with a cabaret, restaurant, and dance hall, the ordinary 'night club' which has become so prevalent under prohibition. Its business, disclosed by the evidence, was of such a character as to furnish great temptation, if not economic necessity, for continuous violation of law. Judge Tuttle, in U. S. v. Boynton (D. C.) 297 F. 261, 267, speaking of such premises, said: 'It is a matter of common knowledge, of which this court will take judicial notice, that the existence of a nuisance of this kind involves, not only the presence of intoxicating liquor, but also the habitual presence of those who come to the premises to sell and to purchase such liquor, and who necessarily assist, and participate in, the continued maintenance of such nuisance. The usual, if not inevitable, result is that the place acquires that "probability that the old customers will resort to the old place," which the law recognizes, in connection with a lawful business, as "good will." * * * So, when a place becomes a public nuisance because intoxicating liquor is there purchased, kept, and sold for beverage purposes, it establishes a reputation and acquires customers who will continue to frequent that location. This naturally and necessarily renders it unusually difficult to prevent further violations of the law in that place, with consequent continuation of the nuisance. It is not to be expected that an owner of premises who has already failed to prevent its use as a public nuisance will be more successful in that re-

spect in the future, notwithstanding the entire innocence and good faith of such owner.' * * * "

Counsel for the government argues that, inasmuch as the business conducted by the defendants is prohibited by the laws of Arizona that this fact should be given great weight by the court in determining the questions involved, and cite Sections 311 and 312 of the Penal Code of Arizona, 1913. Section 311 reads as follows: "Every person who shall keep a public dance house, within the state, is punishable by a fine in any sum, not more than three hundred dollars, or by imprisonment in the county jail, not exceeding six months, or by both such fine and imprisonment." Section 312 reads as follows: "The owner or owners of any building, who shall suffer or permit the same to be used for the purpose of a public dance house by any person, is guilty of a misdemeanor."

So far as I am able to learn, no case involving the violation of this state law has ever been called to the attention of the Supreme Court of Arizona. Counsel advises the court, however, that this statute has been called to the attention of one superior court of the state and that the court held that the law did not apply to the case before it, as the law was passed in the old territorial days and was designed to prohibit the operation of dance halls in connection with saloons. From the evidence, the only additional fixtures necessary in the Joyland Casino and The Palms, to bring them up to the standard of the saloon and the public dance hall of the old territorial days, were the front and back bars, the foot rail, the mirrors, and the polished glassware. I see nothing in the statute to indicate that it was not designed to cover just such places as are involved in this suit.

Eliminating the question last presented, it is apparent to the court, from the evidence, that the property described in the bill as the Joyland Casino and The Palms were, in the months of December, 1926, and January, February, and March, 1927, maintained, operated, and conducted as, and constituted and do now constitute, a public nuisance, as defined by the National Prohibition Act, and should be abated. An injunction will issue enjoining the occupation or use of said buildings and each of them for the period of one year from and after the date of the signing of the decree.

The plaintiff is awarded its costs, to be taxed against the defendant, the same to be a lien upon the property and fixtures.

Counsel for the government will prepare a decree in accordance with this opinion. It is so ordered.